## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **TERESA SCARPULA,** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | |
| **v.** | ] | **CV-05-BE-1324-W** |
| | ] | |
| **BAYER CORPORATION** | ] | |
| **DISABILITY PLAN, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

### <u>MEMORANDUM OPINION</u>

This case came before the court on Defendants' motion for summary judgment (doc. 24). The parties fully briefed the issues in connection with the motion.  Because trial in this case would be conducted as a non-jury trial, the court suggested to the parties that acceleration to a trial based on the briefs presented in connection with the motion for summary judgment may be appropriate.  In their last joint status report (doc. 39), "[t]he parties agree[d] to submit the case for a decision on liability based on written submissions, rather than having a trial with oral testimony."  Consequently, the court reviewed the parties' submissions as the trier of fact and now reaches a final decision on the merits.

### I.  INTRODUCTION

Plaintiff Teresa Scarpulla brings this lawsuit under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132(a)(1)(B),[1] seeking a

---

[1] 29 U.S.C. § 1132(a)(1)(B), which allows claimants to bring a civil action to recover benefits under an ERISA plan, provides:

determination from this court that the Defendants, the Bayer Corporation Disability Plan and

Broadspire Administrator Services, Inc., denied her claim for long-term disability ("LTD")

benefits on May 7, 2003 and October 1, 2003, in contravention of an employee welfare benefit

plan[2] provided by her former employer, Bayer Corporation.  The court has federal question

jurisdiction over Plaintiff's ERISA claim under 29 U.S.C. §1132(e)(1).  For the reasons stated

below, the court concludes that Defendants' denial of Plaintiff's request for LTD benefits was

arbitrary and capricious.  Plaintiff is entitled to LTD benefits for the initial six-month disability

period, but the court will remand the case to Bayer for determination of whether Scarpulla is

"totally disabled" and, therefore, entitled to continuing LTD benefits.  Although Broadspire

makes no effort to distinguish itself from Bayer in this case, the court nonetheless concludes that

Broadspire is not a proper defendant to this action and will dismiss all claims against Broadspire.

---

> (a) Persons empowered to bring a civil action.  A civil action may be brought-
>> (1) by a participant or beneficiary-
>> . . .
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan; . . . .

[2] ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).

## II.  FINDINGS OF FACT

**A.      The Plan**

The Bayer Corporation Disability Plans ("Plan") are governed by ERISA.  Bayer Corporation is the "administrator" as defined by section 3(16)(A) of ERISA.  According to Plan documents, Bayer Corporation is a fiduciary within the meaning of sections (3)(21)(A)(i) and (iii) of ERISA, and a named fiduciary under section 402 of ERISA.  Although Bayer Corporation is the "Plan Administrator," it may employ third parties to perform services in connection with the administration of the Plan.

Bayer Corporation has "the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plans, including, but not limited to, the determination of eligibility for and the amount of any benefit payable under the Plans."  The Plan vests "exclusive discretionary" authority in Bayer Corporation to interpret the Plan and determine all questions arising under the Plan.  Bayer, however, may delegate these responsibilities to third parties.

At the times relevant to this lawsuit, Bayer Corporation employed Defendant Broadspire (formerly Kemper National Services) as the claims administrator to provide administrative and claims processing services to the Plan for LTD benefits.  Broadspire was the "Initial Claim Reviewer" to which Bayer Corporation delegated "the discretionary authority to act on [Bayer Corporation]'s behalf in making initial claim benefit determinations . . . and . . . otherwise interpret[ing] the terms of the Plan with respect to benefits under the Plan."  Bayer Corporation, however, retained "final discretionary authority to determine what benefits shall be paid under the Plan, to interpret Plan provisions, and to otherwise determine the merits of any appeal."

Bayer Corporation created the Bayer Corporation Benefit Administration Committee ("Committee") to assist it in fulfilling its administrative duties under the Plan.  If an employee

appeals a claim denied by Broadspire, the Committee, or its delegate, becomes the claim appeal reviewer.

LTD benefits are paid out of a dedicated trust known as the Bayer USA Incorporated Welfare Benefits Trust (the "Trust").  The Trust is funded by contributions from Bayer Corporation and its affiliates to which the Bayer Corporation has extended the Plan, and by participating employees' salary reduction contributions.  The Trust is used exclusively to pay welfare benefits.  To the extent that the Trust is inadequate to pay benefits, benefits are paid from Bayer's general assets.

Under the Summary Plan Description ("SPD"), short term disability ("STD") coverage continues a Plan participant's weekly base salary when a disability forces the participant to miss work.  STD benefits continue from the participant's first day of absence up to twenty-six weeks. To qualify for STD benefits, a Plan participant must be "disabled," which means: "you are under the care of a physician and, based on medical evidence of your illness or injury, you are unable to do the essential functions of your job."

When a disability continues for more than twenty-six weeks, LTD coverage begins, and the benefits replace a portion of the Plan participant's monthly base salary while she is disabled. The benefit amount is determined in part by income the Plan participant receives from other sources.  To receive LTD benefits, a Plan participant (1) "must be unable to perform the essential duties of [he]r regular occupation;" (2) "must provide the company and claims administrator periodically with proof of [he]r disability;" and (3) "must medically verify [he]r disability."  To continue LTD benefits after six months, a Plan participant must be "totally disabled," which means that she is "unable to work at any job for which [she is] . . . or could become qualified by education, training, or experience."

-4-

According to the SPD, the Plan also provides benefits for partial disability and participation in a rehabilitation program where the participant works part-time during recovery. "The rehabilitation program may provide physical therapy or retraining, or it may be a period of part-time work at . . . [the participant's] old job or a new position."  The rehabilitation program must be approved by Broadspire "before it can be considered rehabilitative."

**B.**     **Plaintiff's Claim for Disability Benefits**

Plaintiff Teresa Scarpulla began employment with Bayer Corporation as a Diabetes Specialist III on February 2, 1998.  As a Diabetes Specialist III, Scarpulla was responsible for the development and implementation of Bayer's strategy for the marketing of its diabetic-support products.  Because the position entailed movement of supplies and sales binders, Scarpulla was required to frequently lift one to ten pounds; to occasionally lift eleven to twenty-five pounds; and to engage in frequent pushing, pulling, and reaching.   The Diabetes Specialist III position required Plaintiff to utilize her far, near, and peripheral vision; to utilize depth perception; to hear; and to drive a motor vehicle.

On April 30, 2002, Scarpulla fell down a flight of stairs in her home.  On the day of her fall, Scarpulla was treated at the Brookwood Hospital Emergency Room for dizziness, loss of consciousness, blurred vision, injury to her head and neck, and general body soreness.  Several days later on May 3, 2002, a CT scan of the head performed by Scarpulla's primary physician showed no abnormality.  Similarly, on May 7, 2002, Dr. Emily Riser, a neurologist, performed an MRI of the brain, which revealed no abnormality.  Given Scarpulla's continued complaints of headaches and dizziness, however, Dr. Riser diagnosed Scarpulla with post concussive syndrome and recommended that she receive STD benefits until August 1, 2002.  Pursuant to Dr. Riser's recommendation, Scarpulla received STD benefits effective May 1, 2002.

In the months following her initial treatment by Dr. Riser, Plaintiff was evaluated by an ophthalmologist, Dr. Douglass Witherspoon, and a neuropsychologist, Dr. Thomas Boll. Dr. Witherspoon's medical records indicated that, although Scarpulla complained of various abnormalities in the temporal vision field and intermittent torsion of image in her right eye, he detected no anatomical basis for these visual symptoms. Nevertheless, Witherspoon speculated that Scarpulla may have experienced a "mild traumatic paralysis of [the] muscle by trauma." Ultimately, Dr. Witherspoon opined that he could offer Plaintiff no therapeutic treatment, but hoped that Scarpulla's symptoms would resolve themselves in the subsequent couple of months.

Approximately one month later on August 16, 2002, Dr. Boll performed a neuropsychological evaluation on Scarpulla. His records indicated that Scarpulla complained of noise sensitivity, significant headaches, dizziness, balance problems, poor short-term memory, and difficulties with comprehension and complex problem solving. According to Dr. Boll, Scarpulla was most concerned about her memory difficulties, a change in personality, and headaches.

After conducting various psychological tests, Dr. Boll noted that Plaintiff experienced obvious difficulties in arithmetic processing, tasks requiring cognitive speed, and difficulty performing executive tasks under time constraints; because of these symptoms, Scarpulla was not driving at that time. Based on Plaintiff's test results, Dr. Boll detected a decline in the areas of the brain "sensitive to the effects of a very mild brain injury or concussion." He suggested that the duration of Scarpulla's symptoms, which he conceded were of a more prolonged duration than usually experienced, might be exacerbated in part by emotional distress "secondary to" the changes in her physical functioning described above.

Ultimately, Dr. Boll concluded that the combination of physical and emotional changes caused a reduction in Scarpulla's cognitive speed and decreased capacity to manage multiple tasks simultaneously.  Dr. Boll seemed to assume that Plaintiff could <u>ultimately</u> return to work, but indicated that any return to work should be done "on a somewhat gradual and initially part-time basis to avoid the negative effects of unusual fatigue which might accompany a full work schedule . . . .  Certainly, prior to that [return to work] an aggressive physical conditioning program would also be very important."

In a follow-up appointment, Dr. Riser interpreted Dr. Boll's report as not precluding Scarpulla's return to work, but as a recognition that Plaintiff could return to work with the appropriate accommodations.  Consequently, Dr. Riser referred Scarpulla to vocational rehabilitation and indicated on a September 5, 2002 Encounter Summary that she was reserving her ultimate conclusion about Scarpulla's ability to work pending a vocational evaluation; therefore, she indicated Scarpulla's date of return to full-time work was "unknown."  Pursuant to Dr. Riser's referral, Plaintiff began vocational training with the Alabama Department of Rehabilitation Services on October 11, 2002.  Defendants were aware that Dr. Riser referred Scarpulla for vocational rehabilitation.

Several weeks later on October 24, 2002, Scarpulla applied to Broadspire for LTD benefits.  Under the Plan, when a Plan participant's disability continues for more than twenty-six weeks, she must submit an application for LTD benefits.  This deadline for Scarpulla was October 30, 2002.  Ironically, as described above, the standards for receiving the initial six months of LTD benefits are remarkably similar to the standards that govern qualification for STD benefits.

On December 5, 2002, Broadspire notified Scarpulla that the medical evidence did not support her application for LTD benefits.  Broadspire's decision was based primarily on Dr. Riser's failure to respond to Broadspire's requests for medical records.  On January 20, 2003, Scarpulla appealed the denial of LTD benefits to the Committee.  She submitted in connection with her appeal the medical records relied upon by Broadspire, Dr. Riser's more recent reports, documentation from the Alabama Department of Rehabilitation Services, and a list of the incomplete evaluations pending at that time.  The pending evaluations included, among other appointments, a neuropsychological reevaluation by Dr. Tom Novack, a vocational capacity evaluation, and a driving assessment.

After completing his evaluation in February 2003, Dr. Novack opined that Scarpulla was a good candidate for vocational training.  More importantly, Dr. Novack indicated that Scarpulla's difficulties with executive skills and speed of cognition made it "questionable if she could return to her previous employment," although he suggested that Plaintiff might be capable of less demanding employment. Scarpulla had not resumed driving at that time, and Dr. Novack recommended a driving evaluation.  Dr. Novack's assessment did not indicate significant emotional distress, but did evidence "mild psychological distress" in connection with Scarpulla's physical deficits.

During the appeal review process, Bayer obtained peer reviews from ophthalmologist Dr. Gil Epstein, neurologist Dr. Vaughn Cohan, and neuropsychologist Dr. Donald Rose.  All three physicians examined Scarpulla's job description; her medical records from Drs. Riser, Witherspoon, and Boll; her May 2002 CT scan and MRI results; and the plan of care from the Alabama Department of Rehabilitation Services.  Drs. Cohan and Rose specifically noted that they did not have results from the most recent neuropsychological exam.  None of the peer

review doctors personally examined Scarpulla or performed any physical capacity or other vocational assessments.

Based only on their review of the listed documents, all of the peer review doctors concluded that Scarpulla did not have a functional impairment that prevented her from performing the duties of her regular occupation. Dr. Epstein's one-paragraph report paraphrased Dr. Witherspoon's report and then, in one sentence, concluded that Scarpulla had no "functional impairment that would preclude work." Dr. Cohan stated that Scarpulla's documented injuries from the fall would not have required her to miss a significant amount of work, and that the documented mild cognitive impairment should not preclude Plaintiff from working. Recognizing that Dr. Rose would review the neuropsychological aspects of the case, Dr. Cohan nevertheless credited Dr. Boll's opinion to the extent it attributed Scarpulla's cognitive problems to psychological and emotional factors.

Dr. Rose, the neuropsychological peer reviewer, recognized that the medical records indicated a "decline in neurocognition," and recommended "gradual supervised work re-entry." Nonetheless, Dr. Rose concluded that these conditions "would not preclude her from working at 'any job' as outlined in her LTD plan." Dr. Rose, therefore, applied the standard for "total disability" rather than the standard for the initial six-month LTD period.

On May 7, 2003, the Committee upheld Broadspire's initial decision to deny Plaintiff's claim for LTD benefits. The Committee's decision was based primarily on the opinions of the three doctors who performed the peer reviews and the opinion of Dr. John Delaney, whom the Committee hired to conduct an "independent review" of the documents relating to Scarpula's claim for LTD benefits. Dr. Delaney reviewed Plaintiff's medical records from Drs. Riser, Witherspoon, and Boll; her May 2002 CT scan and MRI results; and the plan of care from the

Alabama Department of Rehabilitation Services.  With little or no analysis, Dr. Delaney opined

that he did not "feel on the basis of medical records or Ms. Scarpulla's evaluations that she is

disabled from performing her job as a Diabetes Specialist III position."  Dr. Delaney did not

personally examine Plaintiff or perform any physical capacity or other vocational assessments.

Furthermore, nothing in Dr. Delaney's report indicated that he reviewed Dr. Novack's February

10, 2003 neuropsychological evaluation.

 Undaunted by the adverse determination, Plaintiff's counsel notified Bayer on September

2, 2003 of important medical records substantiating Scarpulla's claim for LTD benefits that the

Committee had not reviewed.  The letter specifically mentioned a May 23, 2003 treatment note

from Dr. Jack Denver, a doctor at Lakeshore Rehabilitation Center in Birmingham, Alabama, and

copies of vocational testing performed in March and April, 2003.  Dr. Denver noted that

Scarpulla had experienced a mild traumatic brain injury in April 2002, resulting in

neurocognitive deficits and symptoms of visual changes.  Dr. Denver recommended balance

testing and a vestibular assessment.  The results of the balance testing revealed that Plaintiff's

dynamic balance testing was abnormal and that she showed signs of paroxysmal positional

vertigo.  Furthermore, the results from Scarpulla's vocational testing indicated that she might

benefit from a visual assessment, adjustment counseling, job coaching, and the utilization of

various learning strategies.

 In response to Plaintiff's September 2, 2003 letter, the Committee agreed to reevaluate

Scarpulla's claim for LTD benefits.  Once again, the Committee asked Dr. Delaney to conduct

what it characterized as an "independent review" of Scarpulla's medical records.  Pursuant to the

Committee's request, Dr. Delaney reviewed several additional documents, including the results

of Dr. Novack's February 10, 2003 neuropsychological evaluation; Plaintiff's vocational test

results from March and April, 2003; and Dr. Denver's records and reports from the Lakeshore

Rehabilitation Center dated May 23, 2003.  Although admitting that Scarpulla had undergone

extensive neurological testing, Dr. Delaney suggested that Plaintiff's low processing speed could

be vulnerable to manipulation by the examiner.  Furthermore, based on his interpretation of her

job description, Dr. Delaney reasoned that none of Scarpulla's job duties required her to make

the type of spontaneous decisions that might be impaired by a decreased ability to process

information.  Consequently, Dr. Delaney concluded that his review of the additional medical

records did not change his initial opinion that Scarpulla could return to work on an unrestricted

basis.

    On September 26, 2003 – after Plaintiff's September 2, 2003 letter but prior to the

Committee's meeting to consider Scarpulla's second appeal for LTD benefits – James Martin,

Director of Capital Markets and Trust Investments, advised other Bayer executives via email that

the Trust used to pay LTD benefits would be depleted by May 2004, and asked for an estimate of

the maximum amount of Bayer's contribution to the Trust.  According to a subsequent actuarial

report, as of September 30, 2003, the Trust contained only approximately $7,000,000 in assets,

but had liabilities of $58,000,000 in 2003 .  Martin estimated that Bayer would be required to

contribute at least $45,000,000 to meet the Trust's liabilities.  Several days after this email, on

October 1, 2003, the Committee upheld for a second time Broadspire's decision to deny

Scarpulla's LTD benefits.  The Committee based its decision on Dr. Delaney's opinion.  James

Martin – the same executive who warned of the Trust's financial need – was a member of the

Committee that denied Scarpulla's claim on October 1, 2003.

    In yet further attempts to persuade the Committee to reconsider its denial of LTD

benefits, Plaintiff's counsel, on January 27, 2004 and February 11, 2004, provided Bayer with

additional documentation purportedly supporting Scarpulla's claim for LTD benefits –
specifically, a copy of the deposition testimony of Vocational Rehabilitation Counselor Carol
Pinkard, who testified that Scarpulla did not have the stamina to work a forty-hour week, and a
physical capacities evaluation and clinical assessment of pain form.

On April 29, 2005, Scarpulla received a fully favorable finding of disability from the
Social Security Administration ("SSA").  According to the SSA, Plaintiff's disability onset date
was April 30, 2002, the date of her fall.  The records submitted in support of Scarpulla's claim
for social security disability included the medical records and evaluative reports that the
Committee had previously considered, as well as medical records and evaluative reports that
occurred after the denial of Scarpulla's claim for LTD benefits.  The administrative law judge
("ALJ") considering Plaintiff's social security claim reasoned that Scarpulla's allegations of pain
and functional limitations were "supported by the objective medical evidence and treating
physician opinions and are found to be credible."  Consequently, the ALJ determined that
Scarpulla was unable to perform or tolerate work activity for a full eight-hour workday, forty-
hour workweek, on a sustained basis, at any level of exertion, because of her physical and mental
impairments.

Plaintiff's counsel forwarded the SSA disability opinion to Bayer in a final attempt to
persuade Bayer to alter its decision.  On May 3, 2005, Bayer's counsel responded that "all
internal remedies . . . have been exhausted."  Scarpulla filed suit in this court on July 7, 2005,
alleging that Bayer wrongfully denied her claim for LTD benefits under the Plan.

# III.  DISCUSSION

## A.      Legal Framework

As a fiduciary, Bayer must administer the Plan "for the exclusive purpose of . . .

providing benefits to participants and their beneficiaries" and "in accordance with the documents

and instruments governing the plan."  29 U.S.C. § 1104(a)(1)(A)(i), (D).  Bayer must also

provide a "full and fair review" of claim denials.  *Id.* § 1133(2).

ERISA itself provides no standards for evaluating a plan administrator's determination.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).  Applying *Firestone*, the

Eleventh Circuit has adopted three standards for reviewing such decisions: "(1) *de novo* where

the plan does not grant the administrator discretion[;] (2) arbitrary and capricious [where] the

plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there

is a conflict of interest."  *HCA Health Servs. of Ga., Inc., v. Employers Health Ins. Co.*, 240 F.3d

982, 993 (11th Cir. 2001) (quoting *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997))

(alteration in original).

In *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), the

Eleventh Circuit elaborated on the *Firestone* standards and articulated a multi-step approach for

reviewing "virtually all ERISA-plan benefit denials":

1. "Apply the *de novo* standard to determine whether the claim administrator's benefits
   denial [or plan interpretation] is 'wrong' (*i.e.*, the court disagrees with the
   administrator's decision); if it is not, then end the inquiry and affirm the decision."
   *Williams*, 373 F.3d at 1138; *see also HCA Health Servs.*, 240 F.3d at 993 (applying
   this step when analyzing a claims manager's plan interpretation).

2. "If the administrator's decision in fact is '*de novo* wrong' then determine whether he
   was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse
   the decision."  *Williams*, 373 F.3d at 1138.

3. "If the administrator's decision is '*de novo* wrong' and he *was* vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard)." *Id.*; *see also Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997) (stating that "[a] decision to deny benefits is arbitrary and capricious if no reasonable basis exists for the decision"); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997) (noting that "where the plan affords the administrator discretion, the administrator's fact-based determinations will not be disturbed if reasonably based on the information known at the time the decision was made").

4. "If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest." *Williams*, 373 F.3d at 1138.

5. "If there is no conflict, then end the inquiry and affirm the decision." *Id.*

6. "If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it." *Id.* Heightened arbitrary and capricious review is "somewhere between the *de novo* and 'mere' arbitrary and capricious standards." *Id.* (noting that the Supreme Court has not defined "heightened arbitrary and capricious").

This approach applies to denials based on plan interpretations as well as on factual determinations. *Williams*, 373 F.3d at 1137 n.6. The court must now apply these six steps to the case before it.

**B.     Application**

**1.     *De Novo* Review**

"In this circuit, a district court conducting a *de novo* review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 798 (11th Cir. 1994); *see also Dunlap v. BellSouth Telecomms., Inc.*, 431 F. Supp. 2d 1210, 1217 n.10 (M.D. Ala. 2006); *but see Anderson v. Unum Life Ins. Co.*, 414 F. Supp. 2d 1079, 1103 (M.D. Ala. 2006) (holding that *Kirwan* applies only to the *de novo* "standard of review"and not *de novo* "wrong" review).

Examining <u>all</u> of the evidence included with the parties' submissions, the court easily concludes that Scarpulla meets the Plan's requirements for the initial LTD benefits. The court first notes the similarity between the standards for receiving STD benefits and the initial LTD benefits. Under both standards, the employee must demonstrate that she is unable to perform the "essential functions" of her regular occupation. Bayer approved Scarpulla's STD benefits, yet denied the initial LTD benefits when none of the medical conclusions had changed. In fact, both reports available to the Committee at the time of its decisions, as well as information submitted after those decisions, indicated that Scarpulla was unable to return to her position as a Diabetes Specialist III on the dates Defendants denied Scarpulla's application and appeals for LTD benefits. As discussed in section III.B.4 below, even Bayer's peer review doctors' opinions do not alter this conclusion: one doctor's opinion is wholly conclusory; and another applied an incorrect standard.

Scarpulla's fully favorable SSA benefits determination provides a comprehensive list of the medical evidence supporting Scarpulla's disability. The decision indicates that the SSA ALJ reviewed the same medical records previously submitted to Defendants, as well as additional records created both before and after Defendants' denial of LTD benefits. The SSA ALJ determined that Scarpulla's subjective complaints were adequately supported by objective medical evidence. He concluded that Scarpulla can perform neither her past work nor any occupation existing in the national economy because she cannot tolerate work activity for forty hours per week "at any level of physical exertion." The SSA ALJ found that Scarpulla's disability onset began April 30, 2002, the day of her fall.

Because this court is not limited to the administrative record at this step of its review, the court properly considers the SSA decision. Although the SSA's decision is not dispositive of

Scarpulla's ERISA claim, the SSA finding so well describes Scarpulla's actual medical

conditions as proven by the medical evidence, that the court adopts it as its findings of the

pertinent facts.  Based on its independent review of the supporting medical documents, the court

has no reason to quarrel with the SSA finding.  *See, e.g.*, *Burroughs v. BellSouth Telecomms.,*

*Inc.*, 446 F. Supp. 2d 1294, 1297 (N.D. Ala. 2006), *vacated on other grounds*, 2007 WL 1954050

(11th Cir. July 6, 2007).  Plaintiff submitted this SSA decision to Bayer for a final review, but

Bayer's counsel indicated that Bayer stood by the Committee's two prior decisions and would

not entertain further internal review.  In addition, as of March 24, 2003, Scarpulla still had not

been cleared to operate a vehicle, an essential function of a Diabetes Specialist III.

Having determined that it disagrees with the Committee's decisions under a *de novo*

review, the court now moves to step two of the *Williams* paradigm: did the administrator have

discretion under the Plan?

## 2.    Discretion

The Plan unequivocally vests discretion in Bayer, as plan administrator, to interpret the

Plan and to make all decisions in connection with the administration of the Plan.  Plaintiff's

argument that Bayer's delegation of duties to Broadspire and to the Committee, which is not

comprised solely of Bayer Corporation employees, somehow stops the analysis at this step is

unavailing.  ERISA permits delegation of coverage determinations to third parties, provided that

the plan documents expressly authorize the named administrator to do so.  *See* 29 U.S.C. §

1105(c)(1).

The Plan gives Bayer the authority to delegate its responsibilities to third parties.  Bayer

expressly delegated discretionary authority to make initial claim decisions to Broadspire and the

discretionary authority to determine the merits of appeals to the Committee.  Thus, Bayer,

through the Committee, makes the final decision on benefits claims.  Because Bayer had discretionary authority that it properly delegated to the Committee under the Plan's provisions, the court must apply either the arbitrary and capricious standard or the heightened arbitrary and capricious standard to the Committee's decisions.  *See Anderson*, 414 F. Supp. 2d at 1099-1100 (reasoning that reversal under this step is not required where an entity other than the one expressly vested with discretionary authority makes the decision so long as the plan allows delegation of the discretionary authority).  Because Broadspire, as a third-party claims administrator, was not the plan administrator, and, accordingly, not a fiduciary, Broadspire is not a proper defendant in this action.  *Oliver v. Coca Cola Co.*, 2007 WL 2433087, at *10 (11th Cir. Aug. 29, 2007) (holding that the plan administrator is the fiduciary subject to suit – not an administrative services provider such as Broadspire) (citing *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989)).  Whether the court should apply the "more deferential" arbitrary and capricious standard or the "heightened" arbitrary and capricious standard to the Committee's decisions depends solely upon whether the Plan suffered from a conflict of interest; thus, the court will now proceed to that issue.

### 3.    Conflict of Interest

A conflict of interest exists when a company that both funds and administers a plan pays benefit claims out of its own assets, so that benefit decisions have a direct and immediate impact on the provider's profit margin.  *See Williams*, 373 F.3d at 1135.  Where such a company employs a third party to process claims, it is nonetheless conflicted if it "retains the ability to ultimately control whether to pay out on a claim."  *Id.*

On the other hand, "[this] circuit['s] law is clear that no conflict of interest exists where benefits are paid from a trust that is funded through periodic contributions so that the provider

incurs no immediate expense as a result of paying benefits." *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 856-57 (11th Cir. 2007). The company's responsibility to replenish trust funds is insufficient to create a conflict of interest. *Id.* at 857 (citing *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1273 (11th Cir. 2002)).

Defendants rely, of course, upon the latter line of cases, essentially arguing that, because the Plan is funded through a trust, a conflict of interest cannot possibly exist. The court, however, recognizes that not all trusts are equal. In fact, the existence of a trust is not itself dispositive of the conflict-of-interest issue; rather, a trust creates a presumption that the plan is administered free from a conflict of interest. *See Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1568 (11th Cir. 1990). "Even the broadest delegation of discretion to a trustee or fiduciary is bounded by the limitation that the fiduciary cannot act from a motive other than the accomplishment of the purposes of the trust." *Id.* at 1566.

A trust's insulation from conflicts of interest in the ERISA context is grounded in the concept that payments from trusts – even those funded by the provider – do not have direct impacts on the provider's assets. *See Gilley*, 490 F.3d at 857 (citing *Williams*, 373 F.3d at 1135). Thus, the cases in which the Court of Appeals has recognized the no-conflict presumption involve trusts funded through periodic, non-reversionary contributions. *See, e.g.*, *Gilley*, 490 F.3d 857; *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1273 (11th Cir. 2002) (noting that funding structure was the same as that in *Buckley*, *infra*); *Buckley*, 115 F.3d at 939 (describing funding as fixed, periodic, non-reversionary contributions); *cf. Tippitt v. Reliance Std. Life Ins. Co.*, 457 F.3d 1227 (11th Cir. 2006) (finding conflict where all benefits were paid from the provider's own assets). In this case, however, Bayer's Trust is very different than the trusts at issue in those cases.

-18-

Whereas those cases involved trusts funded by fixed, periodic contributions, the evidence before the court indicates that Bayer only contributed to the Trust from its general assets when James Martin, Director of Capital Market and Trust Investments, advised Bayer executives of the need for a contribution.  In fact, an actuarial report unequivocally indicated that,  at the time of Scarpulla's claim and appeals, the Trust was significantly underfunded.  The report estimated the 2003 year-end Plan liabilities would be more than $54,000,000, but the assets only $7,000,000. Even before this report, Bayer officers knew of the Trust's status.  On September 26, 2003, just days before the Committee denied Scarpulla's appeal a second time, Martin sent an email in which he predicted complete depletion of the Trust by May 2004.  Based on his correspondence from the drafter of the subsequent actuarial report, Martin estimated that a contribution of at least $45,000,000 would be required to meet the Trust's liabilities.  Significantly, Martin served as a member of the Committee that denied Scarpulla's claim again on October 1, 2003.

With such a significantly underfunded trust, a real possibility existed that benefits determinations at that time would directly impact Bayer's profit margin.  Bayer pays benefits from its general assets if the Trust's funds are inadequate.  Martin's knowledge of the Trust's deficiency, and possibly his personal interest as the corporate officer charged with ensuring the Trust's health, cast serious doubt upon the impartiality of the Committee's decision.  If liabilities extinguished the Trust prior to Bayer's next contribution, Bayer would have paid the benefits from its general assets.  The court finds that the circumstances presented by this case differ significantly from those cases in which the Court of Appeals has generally held that the existence of a trust creates a presumption of no conflict of interest.  The court concludes, therefore, that the Committee operated under a conflict of interest at the time it denied Scarpulla's claim for LTD benefits.

-19-

4.      **Arbitrary and Capricious Review**

Having determined that the Committee operated under a conflict of interest, the court

may apply the "heightened" arbitrary and capricious standard of review.  Although the Eleventh

Circuit has recognized this standard where a conflict of interest exists, it has not defined the

parameters of "heightened" review.  The Court of Appeals has not answered the question of how

a court determines the degree to which deference is due when, for instance, the conflict is

overwhelmingly obvious.  In this case, that problem does not require resolution because the court

concludes that the Committee's decisions to deny Plaintiff LTD benefits do not pass muster

under either the heightened arbitrary and capricious standard or the more deferential arbitrary and

capricious standard.  Consequently, the court would rule in favor of Plaintiff even if <u>no</u> conflict

of interest existed.

When applying the arbitrary and capricious standard, "[t]he function of the court is to

determine whether there was a reasonable basis for the decision, based upon the facts known to

the administrator at the time the decision was made."  *Jett v. Blue Cross & Blue Shield of Ala.*,

890 F.2d 1137, 1139 (11th Cir. 1989).  Thus, in arbitrary and capricious review or heightened

arbitrary and capricious review – unlike *de novo* review – the court must evaluate the

administrator's decision based only on the administrative record.  *Paramore*, 129 F.3d at 1451;

*see also Wilcox v. Std. Ins. Co.*, 340 F. Supp. 2d 1266, 1282 (N.D. Ala. 2004) (noting that, in

applying the heightened arbitrary and capricious standard, a court "is limited to the information

before the plan administrator at the time the decision was made to terminate plaintiff's LTD

benefits and through the administrative appeals process").

According to the administrative record, Broadspire's initial denial was based on a lack of

medical evidence – specifically, Dr. Riser's failure to provide updated records.  No question

exists, however, that the Committee had access to all the records of Drs. Riser, Boll, and Novack at the time of its final decision on appeal.  Scarpulla submitted in connection with her appeal the medical records relied upon by Broadspire, Dr. Riser's more recent records, documentation from the Alabama Department of Rehabilitation Services, and Dr. Novack's neuropsychological reevaluation, which was incomplete at the time of Broadspire's initial decision.  None of these records indicated that Scarpulla could return to work at that time; the only reports that reached that conclusion were the peer reviews ordered by the Committee.  Each of the treating physicians – and even one of the peer reviewers – recommended rehabilitation or similar conditioning prior to Plaintiff's return to full-time work.  In fact, Scarpulla was participating in vocational rehabilitation to facilitate return to her previous position as a Diabetes Specialist III at the times of the Committee's decisions.

The peer reviewers based their conclusions, and Defendants defend their decisions in this court, largely on the ground that Scarpulla's treating physicians failed to identify the specific etiology for her symptoms.  Recently, the Eleventh Circuit Court of Appeals encountered this same situation.  In *Oliver v. Coca Cola Co.*, 2007 WL 2433087 (11th Cir. Aug. 29, 2007), the Court reviewed Coca-Cola's denial of LTD benefits based on the employee's failure to submit "objective evidence" of his disability, including identification of a "true organic etiology" for his subjective complaints.  The Court upheld summary judgment for the employee, finding that Coca-Cola's denial was arbitrary and capricious.  Specifically, the Court recognized that "much medical evidence, especially as it relates to pain, is inherently 'subjective' in that it cannot be quantifiably measured.  Indeed, the only evidence of qualifying disability may be . . . 'subjective,' such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms."  *Oliver*, 2007 WL at *12 (citing *Hawkins v. First Union*

-21-

*Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003)).  Because Coca-Cola's

plan did not exclude from coverage disabilities simply because they could not be diagnosed by

"objective" laboratory tests, Coca-Cola's decision was arbitrary and capricious.  *Id.* at *13.

The Court held that Coca-Cola's caprice was further supported by the administrator's and

peer reviewers' "mischaracterization of the evidence."  *Oliver*, 2007 WL at *13.  The primary

peer reviewer only acknowledged one of two tests performed and subsequently reached a

decision that conflicted with the one test he did acknowledge.  *Id.*  Similarly, he focused on a

treating physician's indication of "[m]arked limitation of functional capacity/capable of

sedentary work," yet ignored the remainder of the same report, in which the physician expressly

concluded that the employee was not capable of working.  *Id.* at *14.  Based on this same

indication, the peer reviewer concluded that the employee could work because the job was

"sedentary," but ignored the portion of the report limiting the employee's ability to sit to one

hour at a time.  *Id.*

This case closely resembles the *Oliver* case.  While Scarpulla's treating physicians

<u>implied</u> that she may return to work <u>at some time in the future</u>, Drs. Riser, Boll, and Novack – all

treating physicians – did not conclude that Plaintiff could perform the essential duties of a

Diabetes Specialist III at the time of their reports.  Dr. Boll advised that Scarpulla's ultimate

return to work be "<u>gradual</u> and initially part-time," and that "[c]ertainly <u>prior to that</u> [return to

work] an aggressive physical conditioning program would also be very important."  Dr. Riser's

review of Dr. Boll's opinion recognized that Scarpulla could eventually return to work with

accommodations.  Accordingly, Dr. Riser referred Scarpulla to vocational rehabilitation to

determine under what restrictions she could work; Dr. Riser indicated that the date Scarpulla

could ultimately return to full-time work was "unknown."  Plaintiff began vocational training

with Alabama Department of Rehabilitation Services about one month later and continued that rehabilitation through the times of Defendants' decisions.

Similarly, after completing his evaluation on February 10, 2003, Dr. Novack concluded that Scarpulla was a good candidate for vocational training.  More importantly, Dr. Novack indicated that Scarpulla's difficulties with executive skills and speed of cognition made it "questionable if she could return to her previous employment," although he suggested that Plaintiff might be capable of less demanding employment.  Dr. Novack also recommended a driving evaluation so that Plaintiff could resume driving.  Dr. Novack's assessment did not indicate significant emotional distress, but did evidence "mild psychological distress" in connection with Plaintiffs' physical deficits.

The Committee's denial of Scarpulla's appeal does not discuss these opinions, but in this court Defendants credit these opinions only to the extent that they implied Scarpulla may return to work at some time, and ignore them to the extent they recommended further evaluation to determine the accommodations necessary for Scarpulla to return to work, and the precise time at which she could do so.  The Committee had before it several doctors' opinions that Plaintiff should complete vocational rehabilitation prior to returning to work, as well as the vocational rehabilitation plan that was ongoing at the times the Committee denied Plaintiff's appeals.  The Committee's decision, in the face of ongoing vocational and medical evaluations, that Scarpulla could return to work lacks support in any of the treating physicians' reports, and, therefore, was arbitrary and capricious.

The peer reviews performed at Bayer's request do not adequately discuss the conclusions of Drs. Riser, Boll, and Novack; the Committee's reliance on the peer reviews to undermine the treating physicians' reports, therefore, is arbitrary and capricious.  *See Oliver*, 2007 WL at *15

(holding that, although an administrator may credit reliable non-treating physician opinions that conflict with a treating physician's, the administrator "'may not arbitrarily refuse to credit a claimant's reliable evidence'" (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003))).  The peer reviews focus only on the doctors' inability, at that time, to identify the underlying anatomical cause of Scarpulla's symptoms.  For example, Dr. Cohan seems to rely most heavily on half a sentence from Dr. Boll's report to conclude that Scarpulla's complications were psychological or emotional rather than physical.  In reality, Dr. Boll did not doubt the existence of <u>physical</u> complications, but merely hypothesized that emotional distress <u>secondary to</u> "disruptive" physical conditions may have exacerbated Scarpulla's problems.

Dr. Epstein, the ophthamological peer reviewer, produced a one-paragraph report of less than 125 words, in which he concluded that Scarpulla was not precluded from work.  Dr. Epstein's conclusion was based on Dr. Witherspoon's records.  Dr. Witherspoon, the treating ophthalmologist, could not identify the anatomical cause of Plaintiff's visual symptoms.  Nonetheless, he did not indicate that he believed Scarpulla was malingering; on the contrary, he lamented that he could offer no therapeutic treatment, but hoped the symptoms would resolve themselves.  This is precisely the situation presented in *Oliver*.  Dr. Epstein's wholly conclusory report, morever, does not indicate whether Scarpulla could perform the essential functions of a Diabetes Specialist III; therefore, the court questions whether Dr. Epstein applied the appropriate standard under the Plan.

Dr. Rose's report suffers from the same deficiency.  Although Dr. Rose recognized that the medical records indicated a "decline in neurocognition," and recommended "gradual supervised work re-entry," he applied the standard for "total disability" – not the appropriate standard for the initial six months of LTD benefits under the Plan.  Dr. Rose concluded that no

impairment precluded Scarpulla from working at "any job," rather than her own former occupation as a Diabetes Specialist III.  The Committee, therefore, should not have relied on his opinion.

Dr. Delaney's "independent review," like the peer reviews, fails to accurately characterize the treating physicians' reports.  He stated that the ophthamologists "did not feel that she [Scarpulla] had any real difficulty in vision," and that "[n]eurologic evaluations also agreed that the testing did not support the patient's clinical problems."  Dr. Delaney reviewed the very records discussed above, none of which reached these conclusions.  To the contrary, the ophthamologists could not find an anatomical reason for Scarpulla's visual problems, but they did not state that she had no problems.  Similarly, the neurological reports indicated a decline in cognitive functioning – which even the neuropsychological peer reviewer recognized.

Dr. Delaney's second review, after the Committee agreed to review Scarpulla's claim again, is likewise inadequate.  Looking at the updated records that Plaintiff submitted on September 2, 2003, Dr. Delaney observed that the test results indicated "low processing speed," but noted, without further explanation, that this result "could actually be controlled by the examiners as well."  Dr. Delaney's dismissal of the objective neurological evidence on the basis of potential examiner manipulation strikes the court as results-oriented.  Dr. Delaney did not indicate that any evidence of manipulation existed, yet he felt compelled to offer this criticism.  Regardless, Dr. Delaney concluded that Scarpulla was not required to make "really quick on the line decisions" and, therefore, was not precluded from performing the essential functions of a Diabetes Specialist III.  The Committee's reliance on such a results-oriented opinion qualifies as arbitrary and capricious.  *See Willis v. ITT Educ. Servs., Inc.*, 254 F. Supp. 2d 926, 937 (S.D. Ohio 2003) (holding that reliance on a results-oriented peer review was "faulty").

At the times of their decisions, the Defendants had already given Scarpulla STD benefits; that is, they had already decided that Scarpulla could not perform the essential duties of her occupation.  Nothing changed before the Committee denied Scarpulla's application for LTD benefits, which initially required application of an almost identical standard.  The opinions of Drs. Riser, Boll, and Novack "left open the possibility, but by no means probability, of future employability."  *Willis*, 254 F. Supp. 2d at 938.  Although these opinions were not available to Broadspire at the time of its initial decision, the Committee was obligated to provide a "full and fair review," which includes giving the participant the opportunity to present additional information to perfect her claim.  29 C.F.R. § 2560.503-1(f).  Scarpulla submitted additional documents before both of the Committee's reviews; Defendants, therefore, cannot now hide behind Broadspire's initial denial for lack of these documents.

Bayer acknowledged that the Committee considered the opinions of Drs. Riser, Boll, and Novack, and Bayer's internal records indicate an awareness that Scarpulla was participating in vocational rehabilitation.  The documents indicated, at the very least, that Scarpulla was experiencing problems with depth perception and with driving – two essential functions of her occupation.  By not awaiting results of the pending evaluations and vocational rehabilitation, and instead relying upon peer reviews that were wholly conclusory, mischaracterizations of the evidence, or contradictory to the medical evidence, the Committee acted arbitrarily and capriciously.

In this court, Defendants emphasize everything that <u>was not</u> wrong with Scarpulla from a medical point of view.  "Yet, one need not be a doctor to realize that the human body does not require a malfunction of all its parts before it can be considered, in the employment context, totally disabled."  *Willis*, 254 F. Supp. 2d at 938 (reversing plan administrator's decision as

arbitrary and capricious).  Again, Defendants' primary arguments focus on the doctors' inability to identify the anatomical cause of Plaintiffs' symptoms, and, as a result, Defendants do not accept Scarpulla's subjective complaints and the doctors' conclusions that Scarpulla could not return to work.

To fulfill its fiduciary duty to the Plan participants, however, the Committee should have focused on medical opinions regarding Scarpulla's inability to return to her position at that time – not the doctors' inability to pinpoint precise anatomical conditions causing her symptoms. Although the CT scan, MRI, and ophthalmological examination did not discover a conclusive anatomical cause for Scarpulla's symptoms, several physicians concluded that Scarpulla was experiencing conditions, at the times of those evaluations, that prevented her return to work.  The Committee's decision to deny Scarpulla the initial period of LTD benefits was arbitrary and capricious, even under the more deferential standard.

Given these circumstances, Defendants should have considered, at a minimum, whether Scarpulla was entitled to partial disability and/or rehabilitation benefits as explained in the SPD. Defendants' argument that Scarpulla was not entitled to rehabilitation benefits because she must work part-time during rehabilitation to qualify for such benefits is disingenuous.  The Committee failed to await results from the vocational assessment, which would have determined under what, if any, accommodations or schedules Scarpulla could return to work.  In addition, Drs. Boll and Rose indicated that any return to work must be gradual or part-time.  The SPD does not indicate that Scarpulla was required to expressly request these benefits; in fact, partial disability and rehabilitation benefits are discussed under the heading of "Your Long-term Disability (LTD) Choices," and the application for LTD benefits does not require the applicant to specify a certain type of LTD benefits.

C.      Remedy

Defendants spend much of their briefs arguing that the evidence in the administrative record did not suggest that Plaintiff was "totally disabled." (*See, e.g.*, Defs.' Br. 17-21, 22-23.) The court agrees. As discussed above, the medical records before the Committee at the times of their decisions indicated that Plaintiff could return to work at some undefined time in the future. Rather, this court's determination that the Committee's decisions to deny Scarpulla the <u>initial LTD benefits</u> under the Plan were arbitrary and capricious entitles Scarpulla to only the <u>initial LTD benefits</u>. The administrative record does not support that Scarpulla is entitled to <u>permanent LTD benefits</u> because of "total disability"; the physicians were not asked to address total disability.

The court will remand the matter to Bayer to (1) determine the monetary amount of <u>initial</u> LTD benefits to which Scarpulla is entitled under the court's decision, and (2) determine whether Scarpulla is entitled to "total disability" LTD benefits under the Plan. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000) (recognizing that remand is proper where factual determinations are required to determine a plan participant's entitlement to benefits). Otherwise, the court would be acting as a claims administrator by deciding what Broadspire's and the Committee's decisions would have been had they allowed Scarpulla to complete further testing and vocational rehabilitation. Remand under these unique circumstances is consistent with Congress's intent that federal district courts not function as substitute plan administrators.

On remand, the Committee or the current claims administrator must consider <u>all</u> evidence, including evidence subsequent to the initial denials, in determining whether Scarpulla is "totally disabled" under the Plan. *Shannon*, 113 F.3d at 210.

## IV.  CONCLUSION

For the reasons stated above, the court concludes that the Committee's decisions denying Plaintiff LTD benefits were arbitrary and capricious, under both the "heightened" standard and the "more deferential" standard.  Because the evidence indicated that Plaintiff could not perform the essential duties of a Diabetes Specialist III, she is entitled to the <u>initial</u> LTD benefits provided under the Plan, plus interest.  Because neither party submitted evidence of the value of these benefits, the court will remand the case to Bayer to determine the compensatory damages to which Plaintiff is entitled under the Plan, plus interest.  The <u>administrative record</u> does not, however, support "total disability," as defined for subsequent LTD benefits.  The court, therefore, will remand the case to Bayer to evaluate Scarpulla's claim for LTD benefits based on total disability.

Because Broadspire was not a proper defendant, the court will dismiss Scarpulla's claims against it despite that Broadspire makes no effort to distinguish itself from Bayer.  The court will enter a separate order consistent with this memorandum opinion.

DATED this 27th day of September, 2007.


_Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE